# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

DANIEL DALE PARSONS,

               Petitioner,

    v.

JOSH TEWALT, Director, Idaho
Department of Correction,

               Respondent.

Case No. 1:15-cv-00531-DCN

**MEMORANDUM DECISION
AND ORDER**

Pending before the Court is the Petition for Writ of Habeas Corpus of Idaho state prisoner Daniel Dale Parsons, Jr. ("Petitioner" or "Parsons"), challenging Petitioner's state court convictions. Dkt. 3. The Petition is now fully briefed and ripe for adjudication. Dkts. 3, 38, 39.

The Court previously determined that Claims 6 and 7 were procedurally defaulted. Dkt. 33. The Court did not dismiss those claims to permit Petitioner to show cause and prejudice. In response to the Petition, Respondent argues that additional claims are procedurally defaulted: Claims 3(b), 3(e), 4(d), 4(e), and 5(c). Dkt. 38 at 11-14. The Court also identifies Claim 4(c) as potentially procedurally defaulted because it mirrors Claim 3(e). Respondent also argues that all of Petitioner's claims fail on the merits, under either deferential or de novo review. *Id*. at 22-73.

The Court takes judicial notice of the parties' lodging of the records from Petitioner's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record in this matter,

including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying and dismissing the Petition for Writ of Habeas Corpus.

## BACKGROUND

Petitioner and his wife, Felicia Parsons ("Felicia"), lived in Winnemucca, Nevada. In October 2010 they decided to take a trip to Idaho. The couple drove Petitioner's 2005 silver Mazda RX-8 sports car, equipped with disguises, walkie talkies, a police scanner, and a loaded gun, to Boise, Idaho. They later described the purpose of their trip as a "vacation."

On October 18, 2010, at 1:45 a.m., the couple checked into a local hotel without reservations. Even though they had driven to Idaho from Nevada in their own car, Petitioner had made a one-day reservation for a rental vehicle (a black minivan) from Enterprise Rent-a-Car. At about 8:51 a.m., the couple picked up the black minivan, which bore Connecticut license plates.

At 1:15 p.m., they checked out of the hotel. Felicia was wearing what she described as a "Muslim costume." Petitioner and Felicia drove the black minivan to a KeyBank branch on Overland Road in Meridian, Idaho.

At about 2:30 p.m., as Felicia approached the bank, Keisha Bloxham, a bank employee, was just returning from lunch and pulled into the bank parking lot. Bloxham had been trained to notice out-of-the-ordinary clothing and circumstances. Bloxham immediately noticed Felicia walking toward the bank wearing unusual clothing—a dark hat, sunglasses, and a large scarf or shawl. Bloxham purposely stayed in her car. She

called in to the bank to see if anything had occurred, but she was put on hold. She saw Felicia exit the bank and quickly walk to what Bloxham described as a "navy blue" minivan with Connecticut plates that was waiting in front of a dumpster. Bloxham described the driver of the minivan as a 50-ish balding man, about 250 to 300 pounds. The minivan left the parking lot once Felicia got inside.

At 2:49 p.m., the couple returned to the same hotel and checked into a different room. They returned the black minivan at 8:04 a.m. on October 19, 2010.

On their third day in Idaho, October 20, 2010, Petitioner and Felicia checked out of the hotel at 1:48 p.m. and headed toward a different KeyBank branch, on Broadway Road in Boise, Idaho, in their own silver sports car. Petitioner did not park in the parking lot, but behind a fence near the bank. Twenty minutes after checking out of the hotel, Felicia—in a different wig, sunglasses, gloves, and baggy clothing—entered the bank carrying a tote and a plastic "superman" bag and concealing her loaded weapon. She handed a note to the teller, Paul Lucareillo, that said, "WE HAVE GUNS! MONEY IN BAG!" The teller gave Felicia about $1,791 in cash , including marked bills and a police tracker, which consists of two $20 bills that are sealed together with a computer chip inside.

Felicia ran out of the bank, returning to the car with the cash and the tracker. She shouted, "Go, go, go." Petitioner sped away and merged onto the Interstate.

After the two entered the Interstate, Meridian Police Department Corporal Terry Hodges began getting signals from the police tracker. Hodges noticed the tracker signal was being emitted from either a blue minivan (not to be confused with the earlier black or

"navy" rented minivan that had been returned to the rental company the previous day) or a silver sports car (carrying Petitioner and Felicia). Hodges activated his overhead police car lights behind the two cars, and, initially, both pulled over.

As Hodges got out of his vehicle to check the cars, the silver sports car immediately sped away. Petitioner and Felicia were unaware that, by that time, not one, but several, police cars were involved in trying to apprehend them. The state district court described what happened next—a situation which resulted in the charge of evading law enforcement officers:

> A high speed chase ensues. This high speed chase puts many people at risk. At one point Parsons suddenly leaves I-84 and the chase continues in Meridian. Parsons is on a two-lane road and attaining speeds of up to 90 m.p.h. He crosses into on-coming traffic several times. Police deploy spikes and finally the Parsons leave the roadways at a high rate of speed (calculated at 100 m.p.h. when it left the pavement) and crash in a residential yard, having gone through a wooden fence and landing on the vehicle's roof—just missing children's swings. The Parsons are injured and Parsons' wife immediately admits to being the robber. She tells police that he did nothing and it was all her. In the vehicle, the police find a scanner and a loaded gun with one bullet in the chamber. They also find the stolen money. In the trunk, other disguises could be seen.
>
> Both Parsons were transported to the hospital where Parsons' wife admitted to the two incidents and admitted to several bank robberies in prior years where the robberies were performed similarly—female in wigs, gloves, concealing clothes, and sunglasses using a similar note....

State's Lodging C-1 at 507-08.

Petitioner and Felicia were charged with crimes in the Fourth Judicial District Court in Boise, Ada County, Idaho. Felicia was charged with robbery for the October 20

Boise KeyBank incident, as well as another count of robbery. *See Felicia Parsons v. State*, No. 40585, 2014 WL 2535193, at *1 (Idaho Ct. App. June 2, 2014).[1] Petitioner was charged with aiding and abetting the October 20th robbery and eluding a police officer, along with a persistent violator enhancement. State's Lodging B-4 at 1-2. Before her trial, Felicia pleaded guilty. Petitioner chose to proceed to trial.

Attorney Laurence Smith of the county public defender's office, who had about 20 years of criminal defense experience at the time, was appointed to represent Petitioner at trial. Dkt. A-3 at 23. Smith passed away after Petitioner's trial and thus was unavailable for a deposition or affidavit concerning his trial strategy or other questions about how he conducted Petitioner's defense.

It is clear from the record that Smith decided upon a defense theory of demonstrating that the State did not sufficiently prove beyond a reasonable doubt that Petitioner had aided and abetted Felicia in robbing the Boise KeyBank. Smith decided (1) not to put on Petitioner to testify, (2) to try to keep Felicia from testifying, (3) to have Felicia's out-of-court statements tending to exonerate Petitioner be admitted or at least heard by the jury, and (4) not to put on any defense witnesses but to attack the prosecution's case via cross-examination. In particular, Petitioner's counsel's cross-examination of the state's witnesses reveals that his strategy was to place all the blame on Felicia, and to put the prosecution to its burden of showing that Petitioner was actually

---

[1] The district court sentenced Felicia Parsons to consecutive unified terms of thirty-eight years, with a determinate period of confinement of eighteen years.

aware of what Felicia intended when she entered the second KeyBank on October 20, 2010.

Although Petitioner was not charged with a crime stemming from the October 18 attempted robbery, evidence of that incident was introduced by the prosecution for the purpose of establishing that, on the second occasion, Petitioner had ample notice that Felicia intended to rob the bank.

The jury found Petitioner guilty of both charges and, in a separate phase of the trial, determined that he was a persistent violator. Petitioner was sentenced to two consecutive terms of life imprisonment without the possibility of parole. State's Lodging D-5 at 2. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. State's Lodgings B-4, B-6.

## STANDARDS OF LAW FOR REVIEW OF MERITS

Because disposition of some of the properly-exhausted claims on the merits bears on disposition of several of the procedurally-defaulted claims, the Court will first review the merits of those claim that are properly exhausted.

### 1. AEDPA Deferential Review Standard

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of

Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

## 2. De Novo Review Standard

In some instances AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

## 3. Harmless Error Standard

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637

(1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). However, some types of claims "are analyzed under their own harmless error [or prejudice] standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

## REVIEW OF PROPERLY-EXHAUSTED CLAIMS ON MERITS

### 1. Discussion of Claim 1

#### A. *Ineffective Assistance of Counsel Standard of Law*

The Sixth Amendment to the United States Constitution provides a right to effective assistance of counsel for criminal defendants. The case of *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly-established law setting forth two necessary prongs for a petitioner to show ineffective assistance: (1) that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Under *Strickland*, a petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. *Id.* at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of which witnesses or other evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make

> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690-91. Further, counsel is not deficient in an area where an investigation would

not have been fruitful for the defense.

The Ninth Circuit has provided some insight into the *Strickland* standard when

evaluating an attorney's "strategy calls." First, tactical decisions do not constitute

ineffective assistance simply because, in retrospect, better tactics are known to have been

available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere

difference of opinion as to tactics does not render counsel's assistance ineffective. *United

States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Third, "counsel's investigation must

determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063,

1070 (9th Cir. 2017) ("Weeden's counsel could not have reasonably concluded that

obtaining a psychological examination would conflict with his trial strategy without first

knowing what such an examination would reveal.").

Finally, *Strickland* gives a trial attorney wide discretion with respect to choosing

or abandoning a particular defense. *See Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir.

1998) (holding that counsel's failure to develop a mens rea defense was reasonable

because such a defense "would have conflicted with the primary defense theory of

misidentification"); *Turk v. White*, 116 F.3d, 1264, 1267 (9th Cir. 1997) (counsel's

selection of self-defense theory was reasonable and obviated his need to investigate

defendant's claim of incompetency).

A petitioner must show not only that counsel's performance was deficient, but also the petitioner was prejudiced by that performance. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims

on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S. Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011). That is, when evaluating an IAC claim that the state court adjudicated on the merits, a federal district court's review of that claim, under § 2254(d), must be "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (internal quotation marks omitted).

### B. Discussion of Claim 1

Claim 1 is that defense counsel Laurence Smith performed ineffectively when he failed to interview and subpoena Felicia Parsons as a defense witness at trial. One of the elements the prosecution had to prove to convict Petitioner of aiding and abetting a crime is that a crime was committed. Prior to Petitioner's trial, Felicia pleaded guilty to robbery.

There is no question that Felicia's conviction was admissible and was going to be admitted at Petitioner's trial—either by testimony or stipulation. State's Lodging D-4 at 28. The question before the Court is whether Smith performed adequately in deciding

*how* to have that evidence admitted. Smith's overall defense strategy was to show that the prosecution could not prove Petitioner was involved in the robbery on October 20th. In his opening statement Smith asserted: "One thing that I believe is going to be profoundly evident by the end of this case is that you'll never hear any evidence whatsoever that Mr. Parsons was ever inside the bank, never brandished a gun and never handed anybody a note." State's Lodging A-3 at 155.

Petitioner argues that Smith's performance was deficient simply because he because he failed to actually interview Felicia before choosing not to call her as a witness. Rather than interview Felicia, Smith evaluated information from other attorneys about Felicia's potential trial testimony.

Smith had two letters from the prosecutor. On April 22, 2011, after meeting with Felicia, Prosecutor Shawna Dunn wrote a letter to Smith pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), containing the following information: (1) Felicia said that Petitioner did not know about the robbery until after police attempted to stop them, at which time Felicia pointed the gun at the ceiling and told him she had robbed a bank; (2) Felicia climbed into the backseat of the car and began to point the gun at police; (3) Petitioner was not at the attempted robbery on October 18; (4) Felicia did not threaten Petitioner or point the gun at him; and (5) Petitioner's decision to drive was voluntary. State's Lodging C-1 at 249-50.

On April 28, 2011, after meeting with Felicia a second time, Dunn wrote a second letter to Smith containing the following changed version of Felicia's story: (1) Felicia dressed in "character" at the hotel and traveled to the bank already wearing the wig; (2)

Petitioner knew where to park; (3) Petitioner was aware that she was going to rob the bank prior to her completion of the act; (4) Petitioner did not know she had the gun until after the robbery; (5) it was Felicia's idea to rob the bank; (6) she was counting the money when they saw the police officer's lights; (7) she did not threaten Petitioner nor point the gun at him; and (8) Petitioner's decision to drive was voluntary. State's Lodging C-1 at 251-52. Smith also spoke to Felicia's defense counsel about Felicia's proposed trial testimony.

In addition, Smith had Felicia's comprehensive voluntary hospital interview with police investigators Wigington and Ayotte. *See* State's Lodging C-1 at 300-56. That interview is described in detail in the discussion of Claim 2 below. Importantly, Felicia never mentioned putting a gun to Petitioner's head or forcing him to participate in the robbery in that interview. Prosecutors most certainly would have used the lack of any mention of force in the hospital interview to cross-examine Felicia had she testified contrarily at trial.

After evaluating all the foregoing, Smith wrote a letter to Petitioner explaining:

> In addition to conversations I had with the State's attorneys, I spoke for approximately 30 minutes with Mr. Ellsworth, Felicia's attorney. Felicia will not be called in the State's case in chief. She will only be called by the State as a rebuttal witness if YOU choose to testify, and then only with respect to what transpired after police attempted to initiate a stop. She will testify that she did not threaten you, did not point the gun at you, and that you drove the vehicle voluntarily.
>
> Felicia does not want to testify against you. HOWEVER, it is very clear to me that if WE call her to testify, we will not only open to door to any questions the State may wish to ask, but also, Felicia will testify that she was in costume when you

drove to the bank. Because that testimony, coupled with your
driving away at very high rates of speed will establish the
elements of Aiding and Abetting Robbery, it is my intention
NOT to call Felicia as a witness.

State's Lodging C-1 at 253 (capitalization in original).

Petitioner's argument rests on the fact that on August 17, 2012—after Petitioner's

trial and after Felicia had been sentenced for the robbery—Petitioner drafted an affidavit

that Felicia signed and had notarized, stating:

> (1) That, I Felicia E. Parsons, did attack and threaten to kill
> Daniel Parsons, October 20, 2010.
>
> (2) That, I Felicia E. Parsons, did stick a gun to Daniel
> Parsons head and demand for him to drive, instead of
> pulling over for police on the freeway after the robbery of
> Key Bank, on October 20, 2010. That Daniel Parsons had
> no knowledge before of said robbery, of my intent.

State's Lodging C-1 at 216.

When reviewing Claim 1 on post-conviction appeal, the Idaho Court of Appeals

concluded that, based on the facts known to Smith before trial, he performed an adequate

investigation of Felicia's potential testimony before deciding whether to call her as a

witness. *Id*. at 7. The Idaho Court of Appeals concluded that Smith's decision not to call

Felicia as a witness was "a reasoned tactical decision designed to avoid opening the door

to introduction of incriminating evidence." *Id*. That is, Smith determined what Felicia's

testimony would be and decided that it would not benefit Petitioner. That Petitioner was

able to produce a "post-hoc and contradictory affidavit" from Felicia after trial did not

sway the Idaho Court of Appeals, because trial counsel's decisions are evaluated "based

on the evidence available at the time of the trial." *Id*., citing *Strickland*, 466 U.S. at 689.

This Court agrees. Though Smith did not interview Felicia himself, there is nothing contemporaneous in the record showing that he could not rely on Felicia's own attorney's representation of her potential testimony. Smith did not do everything he could have done, but he did enough to satisfy the standard for effective assistance. Importantly, the two interviews the prosecutor had with Felicia showed her *potential to change her testimony* from one story to another. Smith had to calculate whether—even though Felicia might have testified favorably—the negative facts still might have emerged unintentionally from Felicia under intense cross-examination by the prosecutor. Smith was not required to do any further investigation into what Felicia might have testified at trial. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." (emphasis added)); *Mulligan v. Kemp*, 771 F.2d 1436, 1443 (11th Cir. 1985) ("Although it would have been wiser to interview each of the state's eyewitnesses ..., we cannot conclude on this record that [trial counsel's] conversations with the prosecutor and his prepared cross-examination f[ell] below the 'reasonable substantial investigation' standard.").

Far from being ineffective, Smith carefully and effectively chose quite an ingenious way to have the jury hear most of Felicia's helpful statements and to foreclose the possibility that her harmful statements would reach the jury. That plan was to (1) have only the fact of Felicia's conviction be known to the jury via a stipulated jury instruction; (2) have the jury be able to hear the police audio where Felicia takes responsibility for the robbery and the gun; and (3) have the police officer who interviewed her at the hospital

repeat what Felicia said that was helpful to Petitioner's case, without risking any cross-examination of Felicia herself. As set forth elsewhere herein, the trial transcript reflects that, as Smith planned, the jury did, in fact, hear most of Felicia's helpful out-of-court statements and heard very few harmful statements.

Accordingly, based on the analysis above, this Court concludes that under deferential review of § 2254(d) or de novo review, Claim 1 fails under *Strickland* and is subject to denial and dismissal with prejudice.

**2. Discussion of Claim 2**

Claim 2 is that Smith was ineffective for failing to investigate and pursue a "necessity" defense and request a necessity instruction. Petitioner asserts that this was "the only possible defense." Dkt. 3 at 10-11.

To qualify for a jury instruction for Idaho's common law necessity defense, the defendant must present some evidence of four elements: "(1) a specific threat of immediate harm; (2) the circumstances which necessitate the illegal act must not have been brought about by the defendant; (3) the same objective could not have been accomplished by a less offensive alternative available to the actor; and (4) the harm caused was not disproportionate to the harm avoided." State's Lodging D-5 at 6.

In determining whether to admit evidence related to a defense, a trial court should "'focus on the probative value or the potential adverse effects of admitting the defense evidence' instead of focusing on the strength of the prosecution's case." *Holmes v. South Carolina*, 547 U.S. 319, 329-31 (2006). Doing so ensures that the trial court does not violate a defendant's federal due process right to have "a meaningful opportunity to

present a complete defense." *Id*.

The Idaho Court of Appeals' rejection of Petitioner's affirmative defense claim was simple and straightforward. The court found that the only evidence in the record that supported Petitioner's claim was the post-trial, post-sentencing affidavit of Felicia that was prepared by Petitioner. State's Lodging C-5 at 5. The affidavit was not available to trial counsel before trial. Felicia had *not* admitted to threatening Petitioner with harm in either interview with the prosecutor, in conversation with her own attorney, or in her hospital confession interview with police investigators. "Thus, as noted by the district court, no reasonable view of the evidence available at the time of Parsons' trial supported the giving of a necessity instruction," the Idaho Court of Appeals concluded. *Id*. at 6.

Petitioner points to other portions of Felicia's hospital confession describing how the robbery was all her own doing: "I told him I wanted him to go on vacation with me. I told him I needed him to drive me. And I had to fight and argue with him. I told him that he was going to drive…drive me…be my driver or I was going to find somebody else to do it….Or I was going to do it without him." State's Lodging C-1 at 343-44. Felicia also told investigators that Petitioner "[did] not really [go willingly with her to the bank], but he did it for [her]." *Id*. at 307. She repeated, "This is none of his doing. It's mine…. It was all my doing. This is not his doing, it is my doing…. He was just driving for me." *Id*. at 249. She emphasized many times that Petitioner "has never robbed any banks," and pleaded, "Let him go….just let him go." *Id*. at 325-27. This portion of the statement does *not* support a necessity defense because there is no specific threat of immediate harm.

In the hospital confession, Felicia also described the circumstances when the

couple began to flee the police; again, no threat of harm to Petitioner is evident:

> Uhm…all of a sudden we were like…the cops are after us.
> We (get away) [note that this part was unintelligible to
> transcriber] and…and he was pulling over and I told him not
> to pull over…keep going. And so when we went to stop he
> decided to keep going and the [sic] I jumped in the back and
> pulled out my gun and he told me, "Don't shoot nobody.
> Don't shoot nobody. Put that gun away. Don't shoot nobody."

State's Lodging C-1 at 314. When specifically asked if she had pointed the gun at

anyone, Felicia said, "I pointed it at all the cops that were coming towards me." State's

Lodging C-1 at 314. None of Felicia's hospital confession supports a necessity defense.

Further, nothing in the hospital confession statement shows that Felicia was

holding back any information. For example, at the start of her statement, Felicia said she

understood that the investigators didn't "want any bullshit," and wanted her to tell the

truth and "[not] fuck around." *Id*. at 328. At the end of her statement, she emphasized

twice, "I gave you ever…everything. I gave you everything." *Id*. at 355. Surely, if Felicia

had evidence of threats of harm to Petitioner, she would have included it in her

comprehensive statement.

This Court agrees with the Idaho Court of Appeals that the post-trial affidavit

drafted by Petitioner does not support his ineffective assistance of trial counsel claim,

which is to be judged on what is known at the time of trial. This Court disagrees with

Petitioner that anything in the record before trial showed that Felicia threatened Petitioner

to the degree that it would provide a basis for a necessity defense.

Accordingly, Smith made a reasonable tactical decision not to pursue a necessity

defense or request a necessity instruction. Not only was the decision of the Idaho Court of

Appeals reasonable under § 2254(d), but the Court also rejects these claims under de novo review on the grounds set forth above.

### 3. Discussion of Claim 3(a)

Claim 3(a) is that Petitioner was denied his rights to due process and effective assistance of counsel when trial counsel failed to request a jury instruction on the "rules of law … material to the affirmative defense in order for the jury to make a determination of Mr. Parson's guilt or innocence." Dkt. 3 at 12 (spelling regularized). This error, Petitioner asserts, denied him the "the ability to present his theory of the case." *Id*.

The Idaho Court of Appeals construed this claim as challenging the lack of a necessity instruction. As explained above, a necessity instruction was not warranted because insufficient facts supported such a defense.

Generally, claims of error in jury instructions are matters of state law. *See Williams v. Calderon*, 52 F.3d 1465, 1480–81 (9th Cir. 1995). In particular, the United States Supreme Court has held that the due process guarantee of *In re Winship*, 397 U.S. 358 (1970), does not apply to affirmative defenses. *Gilmore v. Taylor*, 508 U.S. 333, 343–44 (1993).

Failure to give a jury instruction warranted under state law does not by itself merit federal habeas relief. *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).[2] Such an error becomes a federal issue only when the error creates a broader situation in which a criminal defendant is deprived of his due process right to present the defense of his

---

[2] Even if a jury instruction error is only a matter of state law, it still can form the factual basis of a federal ineffective assistance of counsel claim.

choice to the jury. Federal law is clear that a criminal defendant "is entitled to an instruction as to any recognized defense *for which there exists evidence sufficient for a reasonable jury to find in his favor*." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (emphasis added).

When the alleged error involves the failure to give an instruction, the petitioner's burden is especially heavy because "[a]n omission ... of an instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). To warrant habeas relief on this basis, a petitioner must show that the alleged instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *see also Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009) (noting that the "substantial and injurious effect" test applies to the trial court's erroneous failure to provide a jury instruction on the defense theory); *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) (same). A "substantial and injurious effect" in this context means a "reasonable probability" that the jury would have reached a different verdict had the defense instruction been given. *Byrd*, 566 F.3d at 860.

The Idaho Court of Appeals treated Claim 3(a) and the necessity instruction claim as a state law issue, citing six different state cases as the governing standards of law. State's Lodging D-5 at 5-6. As noted above, Plaintiff has not only this hurdle to overcome, but the hurdle that it is an instruction omitted rather than an erroneous instruction given.

Petitioner argues that several other items should have been introduced at trial to add to the weight of evidence that a "necessity" instruction was required. For example, criminalists could find no fingerprints on the scanner that was found in Petitioner's car. Petitioner asserts that this "non-finding" supports his position that he did not commit the crime of aiding and abetting. Petitioner refuses to accept the fact that a "non-finding" as to who touched the scanner is not the equivalent of a "finding" that no one touched the scanner. Similarly, he argues that his fingerprints were not found on the gun.

However, the prosecution did not charge Petitioner with robbery, but with aiding and abetting robbery. No one asserted that Petitioner touched the scanner or the gun. Touching the scanner or the gun were not necessary elements of aiding and abetting a robbery. Felicia's self-described "no bullshit" statement to investigators while she was in the hospital, plainly laid out that she, alone, touched the gun, and that it was her idea, alone, to rob the bank. The scanner and gun evidence would not have substantially aided Petitioner's necessity defense.

Accordingly, Claim 3(a) fails under a federal due process theory because there was insufficient evidence to support the giving of this affirmative defense instruction. The lack of the jury instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict," given the dearth of evidence that Felicia forced Petitioner via threat of harm to participate in the robbery.

For the same reasons, Claim 3(a) fails as a Sixth Amendment ineffective assistance of trial counsel claim. Had Smith requested a necessity instruction, the district court would not have given it. Petitioner is looking at the set of facts from hindsight and

from only his point of view. Reviewing the entire record in this case, this Court finds

that, contrary to Petitioner's point of view, the evidence against him is overwhelming

(borrowing the state court's description), to the degree that Petitioner's arguments seem

frivolous. Therefore, there is neither deficient performance nor prejudice to his defense.

For all of these reasons, Claim 3(a) will be denied and dismissed with prejudice.

### 4. Discussion of Claim 3(c)

Claim 3(c) challenges Smith's failure to object to the phrase "mere knowledge" in

Jury Instruction No. 15, the aiding and abetting instruction, which provided as follows:

> The law makes no distinction between a person who directly participates in the acts constituting a crime and a person who, either before or during its commission, intentionally aids, assists, facilitates, promotes, encourages, counsels, solicits, invites, helps or hires another to commit a crime with intent to promote or assist in its commission. Both can be found guilty of the crime. *Mere presence at, acquiescence in, or silent consent to, the planning or commission of a crime is not sufficient to make one an accomplice.*
>
> All persons who participate in a crime either before or during its commission, by intentionally aiding, abetting, advising, hiring, counseling, or procuring another to commit the crime with intent to promote or assist in its commission are guilty of the crime. All such participants are considered principals in the commission of the crime. Participation of each defendant in the crime must be proved beyond a reasonable doubt.

State's Lodging A-1 at 200 (emphasis added).

Petitioner asserts that Smith should have requested the following language: "mere

*knowledge of a crime and assent or acquiescence in its commission does not give rise to*

*accomplice liability*," in place of the italicized language in Instruction No. 15 above. Dkt.

3 at 12.

Though the Idaho Court of Appeals indirectly touched upon Claim 3(c) in its discussion of Claim 3(f), it did not squarely address Claim 3(c). However, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. Therefore, the Court will presume that Claim 3(c) was denied on the merits. *Richter* instructs that, in this circumstance, the federal district court should consider the theories that could support the state court's rejection of the claim and determine whether fairminded jurists could disagree. *Id*. at 102.

Several theories could have supported the Idaho courts' rejection of Claim 3(c). One is is that Smith did not perform deficiently because Instruction No. 15 already conveyed the essence of Petitioner's desired "mere knowledge" instruction. A comparison of the two sentences establishes that fairminded jurists could determine that the two instructions are so similar that Smith's decision not to request an additional "mere knowledge" instruction was objectively reasonable. Petitioner's desired instruction—"mere knowledge of a crime and assent or acquiescence in its commission does not give rise to accomplice liability"—is only slightly different from the instruction that was actually given—"Mere presence at, acquiescence in, or silent consent to, the planning or commission of a crime is not sufficient to make one an accomplice." State's Lodging A-1 at 200.

A more likely theory is that the instruction given implicitly provided the jury with

the theory Petitioner advances. Dkt. 38, at 32-34. If "[m]ere presence at, acquiescence in, or silent consent to, the planning or commission of a crime" is insufficient for accomplice liability, then "mere knowledge" is similarly insufficient because acquiescence and consent presuppose and are greater than mere knowledge. Therefore, the given instruction covered the concept embodied in Petitioner's desired instruction.

Under any theory, the Idaho Court of Appeals' opinion implicitly denying this claim on the merits is not contrary to United States Supreme Court precedent. Nor does the claim succeed under de novo review. Because the instruction was already clear that if Petitioner's actions did not rise to the level of mere acquiescence or silent consent, then it was implicit that something less than acquiescence or consent—knowledge—would not be enough. This claim is subject to denial and dismissal with prejudice.

### 5.     Discussion of Claim 3(d)

Claim 3(d) is that Smith was ineffective for stipulating to Felicia's robbery conviction in Jury Instruction No. 3 without Petitioner's informed consent. The narrow foundational question at issue is whether stipulating to Jury Instruction No. 3 was a matter of strategy falling outside the category of "important decisions" reserved for the defendant to make.

"An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). A defendant "has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his own behalf, or take an appeal," and

thus defense counsel "must both consult with the defendant and obtain consent to the recommended court of action." *Id*. (internal citations and quotation marks omitted).

Under this case law, a defense attorney is obliged to explain his proposed trial strategy to the defendant. *Id*. at 189. The Court will assume that Smith did not explain his proposed strategy to Defendant until three days before trial, because that disclosure prompted Defendant to want to fire Smith (see discussion of Claims 5(a)(ii) and 5(a)(vii) herein below). Within Smith's strategy, determining the manner in which Felicia's confession would be admitted into evidence clearly is not an "important decision" that Defendant was entitled to make, as defined by *Nixon*, but was a tactical consideration for Smith.

Assuming that Smith's late disclosure of his proposed trial strategy to Petitioner was deficient performance, this Court nevertheless concludes that Smith's decision to stipulate to the entry into evidence of Felicia's conviction via a stipulated jury instruction and to elicit helpful statements of Felicia via other witnesses' testimony was sound and effective trial strategy under the circumstances. There is no prejudice associated with this claim. It will be denied and dismissed with prejudice under all theories.

### 6. Discussion of Claim 3(f)

Claim 3(f) concerns a question the jury asked the trial court during deliberations, as explained by the presiding judge:

> They want to know on Instruction No. 15 can you clarify the term during, when does the commission of the robbery end, when does the commission of robbery begin. And the answer that I intend to give the jury is that they need to reread the instruction.

State's Lodging A-3 at 612.

Both counsel agreed with the trial court's suggested course of action. *Id.*

Petitioner's trial counsel "stated his desire not to define "during" unnecessarily and

preferred the instructions as given." *Id.*

Petitioner challenges the court's and his counsel's action regarding Jury

Instruction No. 15, which provided as follows:

> The law makes no distinction between a person who directly
> participates in the acts constituting a crime and a person who,
> either before or *during its commission*, intentionally aids,
> assists, facilitates, promotes, encourages, counsels, solicits,
> invites, helps or hires another to commit a crime with intent
> to promote or assist in its commission. Both can be found
> guilty of the crime. Mere presence at, acquiescence in, or
> silent consent to, the planning or commission of a crime is not
> sufficient to make one an accomplice.
>
> All persons who participate in a crime either before or *during
> its commission*, by intentionally aiding, abetting, advising,
> hiring, counseling, or procuring another to commit the crime
> with intent to promote or assist in its commission are guilty of
> the crime. All such participants are considered principals in
> the commission of the crime. Participation of each defendant
> in the crime must be proved beyond a reasonable doubt.

State's Lodging A-1 at 200 (emphasis added).

Petitioner argued on appeal that "his trial counsel should have asked the district

court to instruct the jury that a robbery only occurs while the robber is taking the property

of another." He asserted that had "the district court given this information, he would have

been acquitted because he participated only after the robbery took place." *Id.* However,

this suggestion conflicts with the word "before" in the same jury instruction.

The Idaho Court of Appeals turned to the record, which shows that the district court "noted that substantial evidence … was presented in support of Parson's involvement before the robbery." State's Lodging D-5 at 9. In fact, "the district court noted that there was 'virtually no evidence to suggest [Parsons] was doing anything other than aiding and abetting his wife; any suggestion that he did not know what he was up to is inconceivable.'" *Id*. at 9.

In Idaho, whether and how a trial court responds to a jury question during deliberations is a matter within that court's discretion. "The grant of discretion is premised on the assumption that the instructions as given are clear, direct, and proper statements of the law." The Court of Appeals explained that, "if a point of law correctly and adequately covered in a given instruction," the trial court has no duty to further instruct the jury. *Id*. at 9. However, if there is "a defect, ambiguity or gap in the instructions," the trial court does have a duty to further instruction "to alleviate the jury's doubt or confusion." *Id*. at 10.

The Idaho Court of Appeals held that summary dismissal of this claim was proper, because Petitioner had not shown that there was a defect, ambiguity, or gap in the instruction. Therefore, Smith's "failure to recommend an additional instruction under such circumstances cannot constitute ineffective assistance of counsel." *Id*.

This Court agrees. Counsel adequately exercised his strategic judgment to let the instruction stand—for example, the jurors' disagreement on how to interpret "during" might have led to acquittal if not all could agree on what the instruction meant. That the jury *did* convict him cannot be the standard by which the strategy is judged—*Strickland*

specifically warns against trying to apply "20/20 hindsight." Further, Petitioner has provided nothing showing that the trial court and the prosecutor would have agreed with Petitioner's version of how to further instruct the jury—especially given its conflict with the word "before" in the instruction. This claim will be denied and dismissed with prejudice.

### 7. Discussion of Claim 4(a)

Claim 4(a) is that trial counsel was ineffective for failing to object to Detective Wigington testifying on redirect examination about Felicia's out-of-court statement made to him and Detective Ayotte at the hospital, because Detective Wigington did not quote Felicia's out-of-court statement exactly. Wigington testified at trial:

> Q.  [D]uring your conversation with Felicia Parsons, where does she report this money came from?
>
> A.  The Broadway bank.
>
> Q.  And what was she doing with it that it ended up getting spread out all over this car?
>
> A.  She stated that while they were traveling from the bank toward Canyon County, she was initially counting the money at one point inside the vehicle.

(*Id*. at 482-83.)

Petitioner asserts that this testimony harmed his case because it "was used to prove [he] knew she had robbed the bank, but her actual confessed 'I started to' would undermine the state's version that the truth of the matter asserted [sic]." Dkt. 3 at 14. When Petitioner refers to "her actual confessed" words, he is referring to the exact words contained in the transcript of Felicia's hospital confession:

| | |
|---|---|
| Ayotte: | Okay, you ran out and what happened? |
| Felicia: | I ran out and got in the car and told him to drive to the south…to the freeway. |
| Ayotte: | Did you count the money? |
| Felicia: | I started to. |
| Ayotte: | Who was driving? |
| Felicia: | My husband was driving…. |

State's Lodging C-1 at 313.

The Idaho Court of Appeals rejected Petitioner's ineffective assistance claim because he failed to show that Smith's tactical decision to elicit hearsay from Officer Wigington on cross-examination—which would in turn would waive the right to object to rebuttal hearsay on redirect—was "the product of inadequate preparation, ignorance of the law, or some other shortcoming capable to objective evaluation." State's Lodging D-5 at 12. The Idaho Court of Appeals further assumed for the sake of argument that the failure to object was deficient performance, but still determined that no prejudice occurred because the prosecution may have elected to call Felicia as a witness had an objection to the hearsay been made and sustained. *Id*.

This Court agrees. Petitioner is attempting to make a very fine point that does not substantially help his case. Whether the detective quoted Felicia as saying "she was initially counting the money" or "she started to [count the money]" is of little concern. It is quite clear from the car rental, the checking in and out of the same hotel in one day, the items the couple brought from Nevada, the waiting in the car for Felicia to go into and return from banks in costume, and, finally, the high-speed car chase that Petitioner was

aiding and abetting Felicia in a robbery. Petitioner has not shown that an objection would have been sustained because it was fair rebuttal to opening the door to Felicia's out-of-court statements on cross-examination, or, if it had been, that any clarification between "she was initially counting money" and "she started to count money" would have been helpful to his defense. Hence, there is no deficient performance and no prejudice. This claim is subject to denial and dismissal with prejudice.

### 8.  Discussion of Claim 4(b)

Claim 4(b) challenges Jury Instruction No. 3, the stipulation about Felicia's guilty plea. This claim has been adequately addressed above because it is a restatement of Claim 3(d). Claim 4(b), on any variation of legal theory addressing the same factual basis, will be denied and dismissed with prejudice on the grounds set forth in that subsection.

### 9.  Introduction to Claims 5(a) and (b)

Claim 5 is that Smith failed to properly prepare for trial, violating his (a) *Strickland* rights or his (b) *Cronic* rights, based on ten different errors (i) through (x). The Court will first address the simpler claim alternative, which is the *Cronic* theory.

### 10. Discussion of Claims 5(a) and (b): *Cronic* Analysis

#### A.  Standard of Law

The rule of "constructive denial of counsel" set forth in *United States v. Cronic*, 466 U.S. 648, 658–62 (1984), is an exception to the *Strickland* rule requiring that a petitioner demonstrate prejudice from deficient attorney performance. In *Cronic*, the United States Supreme Court explained that prejudice may be presumed in

"circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. The Court articulated three such circumstances: (1) where there is a "complete denial" of counsel at a critical stage of criminal proceedings; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *Id*. at 658–60. *Cronic* applies when "there has been an actual breakdown in the adversarial process at trial." *Toomey v. Bunnell*, 898 F.2d 741, 744 n. 2 (9th Cir.), *cert. denied*, 498 U.S. 960 (1990).

The *Cronic* court further explained the difference between mere attorney error and constructive denial of counsel:

> [T]he adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." *Anders v. California*, 386 U.S. 738, 743 [87 S.Ct. 1396, 1399, 18 L.Ed.2d 493] (1967). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

466 U.S. at 656-57 (footnotes omitted). Unless there is *entire* failure and not simply several specific instances of failure, *Cronic* is not met. *Bell*, 535 U.S. at 697.

## B. Discussion

A review of the trial transcript shows that Petitioner's counsel put on quite an ingenious defense, notwithstanding the fact that there was little to work with to show that Petitioner did not participate in the robbery or elude the police officers. The cross-examination was careful, pointed, and meaningful, always aimed at showing that Felicia robbed the bank and that the witness did not see Petitioner taking part in the robbery. *See, e.g.*, State's Lodging A-3 at 183, 339, 480-82, 500-01, 518-20, 553.

Smith had to put much creative thought and effort into getting Felicia's helpful statements into court while trying to keep her harmful statements out of court. Contrary to Petitioner's insinuations, that the strategy of the case was to require the State to meet its burden of proof does not mean that *Cronic* applies automatically. In fact, that is the sort of defense that was used in *Cronic* that survived a challenge to counsel's effectiveness.

Mr. Cronic asserted that the defense lawyer did not call the defendant to testify and "put on no defense." 466 U.S. at 651. However, even that alleged "deficiency" was *not* enough to satisfy the standard of failing to "subject the prosecution's case"—a criminal charge that Mr. Cronic was involved in a sham business— "to meaningful adversarial testing." *Id*. at 659. What Mr. Cronic's counsel *had* done was enough:

> By cross-examination of Government witnesses, . . . he established that Skyproof was not merely a sham, but actually was an operating company with a significant cash flow, though its revenues were not sufficient to justify as large a "float" as the record disclosed. Cross-examination also established the absence of written evidence that respondent

had any control over Skyproof, or personally participated in
the withdrawals or deposits.

*Id*. at 651.

In *Bell v. Cone*, the United States Supreme Court reiterated how difficult it is to

show that an attorney fell below the "meaningful adversarial testing" standard:

> We said "if counsel *entirely* fails to subject the prosecution's
> case to meaningful adversarial testing." *Cronic,* [466 U.S.] at
> 659 [emphasis added in *Bell]*. Here, respondent's argument is
> not that his counsel failed to oppose the prosecution
> throughout the sentencing proceeding as a whole, but that his
> counsel failed to do so at specific points.

535 U.S. at 697.

Petitioner's trial record reflects that Smith reviewed and investigated the evidence.

He determined whether to use Felicia as a witness, or whether to employ a stipulation. He

decided whether to put on evidence and whether to have Petitioner testify. He objected

when necessary. He gave an adequate opening statement and an adequate closing

argument. There is nothing in the record suggesting that Smith's performance was the

equivalent of a "complete denial" of counsel or that Smith "entirely fail[ed] to subject the

prosecution's case to meaningful adversarial testing." *See Cronic*, *supra*. No reasonable

jurist would agree that *Cronic* applies to Petitioner's trial, and thus this claim fails on the

merits. Where counsel did something, rather than nothing, the case is to analyzed under

*Strickland*, not *Cronic*. *Bell*, 535 U.S. at 697-98. Petitioner's *Cronic* claim, consisting of

Claims 5(b)(i) through (x), is denied and dismissed with prejudice.

## 11. Discussion of Claims 5(a) and 5(b): Alternative *Strickland* Analysis

Because Petitioner has not shown that *Cronic* is applicable to his circumstances,

by default *Strickland* operates to govern his claims. *Bell*, 535 U.S. at 697–98 ("The aspects of counsel's performance challenged by respondent … are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components…. The remaining issue, then, is whether respondent can obtain relief on the ground that the state court's adjudication of his claim involved an 'unreasonable application' of *Strickland*.").

Moreover, on federal habeas review, it is not the federal court's opinion on whether the state court "applied *Strickland* incorrectly" that is the measuring stick for granting the writ, but whether the state court was objectively unreasonable in its application. *Bell*, 535 U.S. at 699-99. The double deference that applies when reviewing ineffective assistance claims in habeas proceedings leaves no room for this Court to second-guess, with the benefit of hindsight, the tactical decisions of Petitioner's counsel. *Pinholster*, 563 U.S. at 189; *Strickland*, 466 U.S. at 689.

Prejudice under these circumstances means there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

### A. Discussion of Claim 5(a)(i)

Petitioner alleges that counsel failed to obtain the police car camera video of the pursuit of his silver sports car on October 20, 2010. Even if counsel was deficient in failing to obtain the video, Petitioner has not shown that the failure caused his defense prejudice. Several officers described their pursuit of Petitioner's vehicle at trial. *See*

State's Lodging A-3. Petitioner has not shown that the video would have contradicted their testimony or raised doubt as to the aiding and abetting or eluding the officers charges.[3] Because Petitioner has failed to show any prejudice, this claim will be denied and dismissed with prejudice.

### B. Discussion of Claim 5(a)(ii)

Petitioner asserts that counsel was ineffective for failing to interview Petitioner more than three days before trial. At that time, Smith interviewed Petitioner for about two hours. Petitioner then decided that he wanted to represent himself, based on a difference of opinion on defense strategy. This claim appears to be part of the factual basis for Claim 5(a)(vii), and so the Court will address this claim in that subsection below. To the extent that this claim is a stand-alone claim different from Claim 5(a)(vii) the Court rejects it for failure to show any prejudice that resulted to the defense by the timing of Smith's interviews with Petitioner.

### C. Discussion of Claim 5(a)(iii)

Petitioner asserts that counsel was ineffective for failing to interview Felicia or read and listen to her confession. The Court has already determined above that the failure to interview Felicia was not deficient performance and did not prejudice Petitioner's case. Petitioner has not shown that counsel failed to read and listen to Felicia's confession. On the contrary, it appears that this was one of the grounds upon which counsel based the defense strategy, including the tactical decision on how to cross-examine the

---

[3] The video that was used at trial showed Felicia and Petitioner still trapped within the car after the pursuit ended by Petitioner wrecking his car.

investigators. Smith could not have cross-examined Detective Wigington in the manner he did without having read Felicia's confession. Petitioner has failed to show either deficient performance or prejudice related to this claim. It will be denied and dismissed with prejudice.

### D. Discussion of Claim 5(a)(iv)

Petitioner asserts that Smith failed to read police reports until the day of trial. Assuming that this is true, Petitioner has failed to show any prejudice to his defense. This claim is subject to dismissal with prejudice.

### E. Discussion of Claim 5(a)(v)

Petitioner asserts that Smith failed to advise him of counsel's legal and factual analysis of the case. Petitioner states that he wrote several letters to counsel suggesting potential witnesses for trial and asking Smith to obtain the police video of the car pursuit. Petitioner also asked counsel to provide legal advice about the necessity defense and whether he should testify at trial.

Petitioner alleges that he did not hear back from Smith on these points. However, Petitioner has not provided the names of the witnesses or the content of their testimonies, let alone information on whether they were available at trial. He has not shown how the police video would have made a difference in any of his convictions.

It is understandable why Smith did not put Petitioner on the stand. Petitioner's preferred "necessity defense" was quite unbelievable, and Smith's chosen defense that Petitioner did not participate at all in the robbery was more convincing under the facts. Petitioner's proposed testimony was very likely to be focused on the "necessity defense,"

which was contrary to and would have harmed the chosen defense—that Petitioner did not know the robbery was going to occur.

In addition, had Petitioner testified, the prosecution would have been able to introduce Petitioner's prior felony convictions related to credibility to the jury. State's Lodging A-3 at 20. Petitioner's extensive criminal history was detailed by the state post-conviction court:

> Parsons himself has a very long criminal history with multiple felony convictions. His first arrest was at age 23 in 1981. However, as the State argued at sentencing, Parsons admitted to criminal behavior two years before when he admitted to burglarizing a doctor's home twice to steal guns, jewelry, prescription medication, and cash. He admitted to extensive narcotics dealings and tells the presentence investigator this was driven by greed. For example, he sold ½ gram of cocaine to an undercover agent for $1,250 and then attempted to speed away and crashed into a sheriff's car that was sealing an exit. In his car law enforcement found marijuana, cocaine, mushrooms, hash oil, prescription pills, and $3,600 in cash. The judge in that case, based on his claim that he had learned his lesson, placed him on probation. However, just 5 years later, as the State argued, he had "graduated" to armed robbery where he robbed a credit union at gunpoint. Just a month later he pointed a gun at a grocery store manager and ordered him to open a safe. Then less than a month later he committed another armed robbery when he and another individual went to a grocery store wearing masks, pointing a gun, and demanding money. This time he received a significant sentence and was not released until April 2005. In 2007 he was arrested for home invasion and stalking. This was reduced to a misdemeanor.

State's Lodging C-1 at 508. Granted, not all of this information would have been admissible, but Petitioner's prior felonies that implicated credibility would have been. Silence was a better alternative.

Because Petitioner has not shown prejudice from any of these complaints about his counsel's preparation and presentation of the case, this claim fails and is subject to denial and dismissal with prejudice.

### F.  Discussion of Claim 5(a)(vi)

Petitioner reported to counsel that Felicia had threatened to kill Petitioner, but Smith allegedly failed to investigate Felicia's alleged threats. It is unknown whether or to what extent Smith investigated these allegations. However, it is clear from the record that Smith spoke to the prosecutor and Felicia's attorney to ascertain the content of her anticipated trial testimony. None of Felicia's pretrial confessions revealed an admission of a serious threat to Petitioner. As a result, it was clear that at trial she either (1) would testify that she did not threaten Petitioner; or (2) would testify that she did threaten Petitioner, but she would be impeached by her prior confessions that were devoid of any threats of harm.

Therefore, the Court concludes that the record makes it clear that counsel conducted sufficient investigation into the alleged threats (the record is devoid of any threats, and so little investigation was necessary). Alternatively, even if counsel performed deficiently, there was no prejudice to Petitioner's defense. Accordingly, the claim will be denied and dismissed with prejudice.

### G.  Discussion of Claim 5(a)(vii)

Petitioner asserts that Smith failed to consult with Petitioner for more than one to two hours, and that Smith did nothing to prepare for trial other than to interview him two hours before trial. As discussed above, the record does not bear out the allegations that

Smith did nothing to prepare for trial.

Assuming that counsel was deficient in failing to meet with Petitioner sooner, or failing to change the trial strategy to please him, still Petitioner has not shown prejudice. Necessity clearly was *not* a better strategy. The lack of prejudice from the alleged omissions and decisions of counsel causes the ineffective assistance claim to fail. It will be dismissed with prejudice.

### H.    Discussion of Claim 5(a)(viii)

Petitioner asserts that Smith was ineffective for failing to provide him with all the requested documents and information he wanted prior to trial. Petitioner cited this as a reason he wanted to fire his counsel and proceed pro se. Petitioner does not set forth which items he was missing and how that prejudiced his case.

Nevertheless, the Court reviewed the state court record to discern the factual basis for this claim. The post-conviction record shows that Petitioner wrote to Smith on January 5, 2011, asking for statements of codefendant, car inventory, fingerpoints [sic], handwriting analysis, alcohol and drug tests on Felicia and himself, the police report and recordings of the car chase, and a copy of the preliminary hearing transcript. State's Lodging C-1 at 240. On January 27, 2011, Petitioner wrote another letter to Smith, asking for information on the planned defense and informing Smith that he has not been able to reach him by phone. *Id*. at 241. Smith wrote back to Petitioner on January 31, 2011, telling Petitioner how to schedule phone appointments and, informing Petitioner that he would receive the discovery that Smith had in his file under separate cover (except for CD/DVD evidence). *Id*. at 242.

On February 7, 2011, Petitioner wrote to Smith informing him that "the State has not provided complete discovery." *Id*. at 243. He asked Smith, "Please show me all DVDs that you have." There is nothing in the letter indicating that Petitioner had not received the discovery Smith *had* sent—albeit it was not everything Petitioner had requested. *Id*. Smith's follow up letter of February 8, 2011, indicated that his assistant had sent "everything we have (minus CDs/DVDs) to Petitioner on January 31. *Id*. at 244.

Petitioner raised this issue with the trial court on March 2, 2011. Petitioner stated that he wanted Smith to provide him with "stuff that hasn't been available to me like CDs and DVDs" and the unredacted versions of police reports. State's Lodging A-2 at 5. At the hearing, Smith responded generally, but not specifically, about the particular items Plaintiff wanted. The trial court took Smith at his word because the court found him generally to be competent and experienced, explained to Petitioner that the court had recently ordered the unredacted versions of the police reports to be made available, and said that if Smith "tells me that he gave you the discovery, then he gave you the discovery." State's Lodging A-2 at 6-10. In short, the record reflects that neither Smith nor the trial court particularly responded to Petitioner's statements that the CDs/DVDs and the unredacted police reports were not in his hands. Because the trial court somewhat ignored Petitioner's *exact* claim, this Court reviews the claim de novo.

On April 13, 2011, Petitioner wrote to Smith asking several questions about the defense to be put on at trial. On April 18, 2011, Smith wrote back and answered Petitioner's questions, notifying him, "I continue to sift through the growing amounts of discovery in your case, to communicate with the State, and to communicate with Felicia's

attorney." State's Lodging C-1 at 248.

On May 2, 2011, the day before trial, Petitioner told the trial court that he desired to represent himself because he and Smith had "fundamentally … a disagreement on how to proceed because of strategy." State's Lodging A-3 at 19. The trial court probed whether Petitioner knew how to conduct a trial, and he did not. Therefore, after a discussion on the record with the trial court, Petitioner decided that he wanted Smith to represent him at trial. State's Lodging A-3, at 16-24.

Even if Smith performed deficiently, Petitioner has not shown prejudice resulted from Smith not providing him with the particular items Petitioner requested. The record is clear that Smith provided Petitioner with some, but not all, of the discovery that was provided by the State in Petitioner's case. Petitioner has not shown that there is a reasonable probability—sufficient to undermine confidence in the outcome—that, but for counsel's failure to provide Petitioner with these items, the result of the proceeding would have been different. Therefore, this claim in all its aspects fails under deferential and de novo review and is subject to denial and dismissal with prejudice.

## I.  *Discussion of Claim 5(a)(ix)*

Petitioner asserts that Smith failed to keep confidential Petitioner's statements that Felicia coerced him to drive to the robbery. Petitioner asserts that he confided in counsel that Felicia had coerced him to drive the getaway car. Petitioner takes issue with the fact that Smith provided this information to the prosecutor during plea negotiations without the consent of Petitioner. He asserts that this is a violation of the attorney-client privilege, and that he did not even want a plea agreement but wanted to proceed to trial.

Smith was not amiss in exploring plea agreements for Petitioner, especially with the facts arrayed as they were against Petitioner on both substantive charges *and* with the persistent violator charge; Petitioner might have changed his mind had the State offered favorable terms. Even assuming that Smith performed deficiently by pursuing settlement negotiations and informing the State ahead of trial that Petitioner would be relying on a theory that he did not know Felicia was going to rob the bank, Petitioner has not shown prejudice to his defense. All that is known is that, after the State learned this defense theory, it asked to have the scanner was tested. No fingerprints were revealed in the testing. This claim fails for lack of prejudicial effect. It is subject to denial and dismissal with prejudice.

### J.  Discussion of Claim 5(a)(x)

Petitioner contends that Smith did not realize that the lack of Petitioner's and Felicia's fingerprints on the gun could have been used at trial to raise a reasonable doubt. Dkt. 3 at 18. Smith wrote a letter to Petitioner on April 28, 2011, three days before trial, stating: "the Criminalistics Analysis Report regarding the fingerprint analysis [shows] the tests are not conclusive and are essentially useless to both the State and to us as they can neither prove nor disprove that either you or Felicia had contact with the gun." State's Lodging C-1 at 253.

The Criminalistics Analysis Report showed that there were latent fingerprints on the gun. It concluded: "No identifications were established." *Id*. at 281. There were "inconclusive results" as to Petitioner "due to a lack of sufficiently clear detail in the latent prints and known impressions." Felicia was excluded as the source of some of the

latent prints because enough detail was present for that conclusion. Felicia could not be excluded from another of the latent prints. *Id.*

Petitioner believes that Smith should have used the gun and scanner fingerprint evidence to show that Petitioner's fingerprints were not found on the gun and the scanner. The gun report does not show that Petitioner's fingerprints are not found on the gun; they simply show that fingerprints appear on the gun but cannot be matched to anyone *because of the quality* of the fingerprints. In fact—while the testing specifically excluded Felicia from some of the latent prints—it did not specifically exclude Petitioner from any of the latent prints. Therefore, if the prosecution highlighted that important point on rebuttal, the report likely would have been more damaging to Petitioner on rebuttal than any help gained by suggesting that the unknown fingerprints on the gun were not Petitioner's.

A better piece of evidence was Felicia's own statement taking ownership of the gun right after the car wreck, which was on a video and audio recording. Smith did not object to admission of this evidence, which was a better strategy to show that the gun was Felicia's than trying to use the inconclusive gun fingerprint report.

Even assuming that Smith was ineffective for not using at trial the police scanner fingerprint report that showed conclusively that no one's fingerprints, including Petitioner's, were on the scanner, Petitioner has not shown that *Strickland* prejudice resulted— a reasonable probability that, but for the omission of the scanner fingerprint-less evidence, the result of the proceeding would have been different. Too many other certain facts placed Petitioner in the planning and execution stages of the robbery. In

addition, the scanner had to be placed in the car by someone; the lack of anyone's

fingerprints on the scanner does not detract from its presence in the car. This claims fails

because the prejudice prong of *Strickland* has not been met. It will be denied and

dismissed with prejudice.

### K. Discussion of Claim 8

Claim 8 is that Petitioner's direct appeal counsel, Greg Silvey, performed

ineffectively on direct appeal. The *Strickland* principles also apply to determining

ineffective assistance of appellate counsel claims. *Evitts v. Lucey*, 469 U.S. 387 (1985).

To show prejudice on appeal, a petitioner must show that his attorney failed to raise an

issue obvious from the trial record that probably would have resulted in reversal. *See*

*Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show

that an attorney's act or omission would have resulted in reversal, then he cannot satisfy

either prong of *Strickland*: appellate counsel was not ineffective for failing to raise such

an issue, and petitioner suffered no prejudice as a result of it not having been raised. *See*

*Miller*, 882 F.2d at 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal

every question of law or every nonfrivolous issue requested by a criminal defendant.

*Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires

"judges to second-guess reasonable professional judgments and impose on appointed

counsel a duty to raise every 'colorable claim' suggested by a client." *Id*. at 754. "[T]he

process of winnowing out weaker claims on appeal and focusing on those more likely to

prevail, far from being evidence of incompetence, is the hallmark of effective appellate

advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

Petitioner asserts that, prior to Silvey's preparation of the appellate brief, Petitioner wrote him a letter delineating numerous claims he desired to raise on appeal. Dkt. 3 at 24. Silvey gave Petitioner the choice of proceeding pro se or proceeding with counsel, in which case Silvey made it clear that he would not be presenting a supplemental brief to include other claims. *Id*.

Silvey told Petitioner that the claims he wanted to bring could not be brought on appeal because his trial counsel had not objected to the alleged trial errors. Silvey also advised Petitioner that he could bring the claims as ineffective assistance of counsel claims on post-conviction. In addition, because Silvey thought the prosecutorial misconduct claims also needed extra-record evidentiary development, he told Petitioner to bring those claims on post-conviction review, as well. As it turns out, on post-conviction appellate review the Idaho Court of Appeals disagreed with Silvey as to the prosecutorial misconduct claims, refusing to hear them because they should have been brought on direct appeal. State's Lodging D-5 at 14.

During post-conviction appellate review, the Idaho Court of Appeals examined whether Silvey performed deficiently on direct appeal and rejected Petitioner's claim of ineffective assistance, opining:

> Parsons failed to allege in his petition what arguments his
> appellate counsel should have raised or how he was
> prejudiced by his appellate counsel's actions, although he
> improperly tries to remedy this failure on appeal. Moreover,
> Parsons has presented no argument or authority to show that

> any unraised issue were clearly stronger than those raised….
> Accordingly, Parsons has failed to raise a genuine issue of
> material fact that his appellate counsel provided ineffective
> assistance.

State's Lodging D-5 at 13-14.

The Court reviews this claim de novo. The issue is whether Petitioner has raised a potential appellate claim that Silvey failed to raise that (1) was obvious from the trial record and (2) that probably would have resulted in reversal.

In his Reply brief, Petitioner identifies the claims as the "ineffective assistance [of trial counsel] issues, such as the Confrontation Clause violation and Prosecutorial Misconduct." Dkt. 39-6 at 17. Other than the ineffective assistance claims, these are the claims that Silvey told Petitioner should be brought on post-conviction review, when, in fact, they should have been brought on direct appeal. However, this Court determines elsewhere in this Order that the ineffective assistance of trial counsel claims, including the Confrontation Clause claims and the prosecutorial misconduct claims, are without merit on de novo review. Therefore, the claims would not have been successful had they been raised on direct appeal. Accordingly, Silvey did not perform deficiently and there is no prejudice arising from narrowing the potential claims for appeal. Petitioner has no persuasive argument why any of his preferred claims would have been as strong as or stronger than the one that Mr. Silvey presented on appeal—whether "the district court gave an erroneous jury instruction during the persistent violator phase of trial that partially relieved the State of its burden of proving two prior felony convictions." State's Lodging B-4 at 1. For these reasons, Petitioner's ineffective assistance of direct appeal

counsel claim will be denied and dismissed with prejudice.

## REVIEW OF PROCEDURAL DEFAULTED CLAIMS

### 1. Standard of Law for Procedural Default

In general, if a petitioner did not bring his federal claims before the highest state court in a procedurally proper way, then a federal district court cannot adjudicate the claims in a later federal habeas corpus petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991) (internal citation marks omitted).

A procedurally defaulted claim will not be heard in federal court unless the petitioner shows either that there was legitimate cause for the default and that prejudice resulted from the default, or, alternatively, that the petitioner is actually innocent and a miscarriage of justice would occur if the federal claim is not heard. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Upon a review of the record, the Court agrees with Respondent that the following claim are procedurally defaulted because Petitioner failed to present the legal and factual bases of the claims to the Idaho Supreme Court and it is now too late to do so: Claims 3(b), 3(e), 4(c), 4(d), 4(e), 5(c), 6, and 7. Rather than engage in a lengthy and complicated procedural default analysis, the Court concludes it is more efficient to address Petitioner's claims on de novo.[4]

---

[4] In addition, based on the entirety of the record and the discussion in this Order, the Court concludes that Petitioner has not shown that he is actually innocent.

## 2. Discussion of Claim 3(b)

Claim 3(b) is that trial counsel failed to request a cautionary instruction on the accomplice testimony and corroborating evidence. Petitioner has not explained how this is different from his other claims of jury instruction error. Upon a review of the jury instructions in the light of the record, the Court finds nothing related to this area that would amount to deficient performance or prejudice. Therefore, this claim is subject to denial and dismissal with prejudice.

## 3. Discussion of Claim 3(e)

Claim 3(e) is that Smith failed to object to Instruction No. 5: "Some of you have probably heard the terms circumstantial evidence, direct evidence and hearsay evidence. Do not be concerned about these terms. You are to consider all the evidence admitted in this trial." State's Lodging A-3 at 139. Petitioner argues that Smith failed "to object to the trial court's requirement for the jury to hear 'hearsay' and failed to instruct them about Idaho Rule of Evidence 801(c) about hearsay." Dkt. 39-2.

Smith was not deficient in failing to object. This general instruction, given at the beginning of trial, was necessary to inform the jury that it was to consider *all* evidence *admitted* at trial. If an objection was made as to "hearsay" and sustained during the trial, the court would then particularly instruct the jury not to consider the statement. In general, it is to be expected that some hearsay evidence will be admitted at trial based on attorney-court discussions outside the jury's presence, motions in limine, or attorney stipulations. In addition to Instruction No. 5, the totality of the jury instructions covered all of the necessary points, for example: "The law requires that your decision be made

solely upon the evidence before you"; "in determining the facts you must – you may consider only the evidence admitted in this trial"; and "[I]f I tell you not to consider a particular statement or an exhibit, you should put it out of your mind and not refer to it or rely to [sic] it in your later deliberations." State's Lodging A-3 at 137-139.

As explained elsewhere, Smith's strategy was to use certain hearsay statements to his client's advantage by either cross-examination or remaining silent during direct examination rather than objecting to hearsay. This strategy helped protect against most of the harmful evidence that otherwise could have been admitted. Petitioner's claim fails on the merits for failure to show deficient performance or prejudice to his case. It will be denied and dismissed with prejudice.

### 4. Prosecutorial Misconduct Claims Standard of Law

Many of Petitioner's procedurally-defaulted claims are prosecutorial misconduct issues. They are presented either cloaked in an ineffective assistance of counsel claim—which requires proof of an extra set of elements to prevail—or as a stand-alone due process claim. Because the Due Process Clause guarantees the right to a fair trial, prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). Prosecutorial misconduct acts will warrant habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

A court must consider the record as a whole, because even a prosecutor's

inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context. *See United States v. Young*, 470 U.S. 1, 16-17 (1985); *Darden*, 477 U.S. at 182. The Supreme Court distinguished between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process." *Donnelly*, 416 U.S. at 647-48. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

A prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury." *Darden*, 477 U.S. at 192 (internal quotation marks omitted). However, a prosecutor's closing argument, "billed in advance to the jury as a matter of opinion not of evidence," is "seldom carefully constructed" and may contain "[i]solated passages" that are "less than crystal clear." *Donnelly*, 416 U.S. at 646-47. Therefore, a court must not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647. In addition, when a prosecutor's allegedly improper comments occur in a rebuttal closing, those comments "must be evaluated in light of the defense argument that preceded [them]." *Darden*, 477 U.S. at 179.

### 5. Discussion of Claim 4(d)(i)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's opening statement referring to facts allegedly not supported by the evidence. Petitioner

challenges the prosecutor's opening statement to the jury that, "when asked, Mr. Parsons explained that they were here on vacation, but this was no ordinary vacation." State's Lodging A-3 at 147. The prosecutor then went on to describe the bank robbery. Petitioner claims this statement constituted misconduct because it was actually Felicia, not Petitioner who reported they were on vacation. (Dkt. 3 at 20.)

However, the prosecutor's statement accurately described the evidence later admitted at trial. Officer Dave Saindon testified that, while riding with Petitioner in the ambulance, Petitioner stated that he "was vacationing" in Idaho with his wife, Felicia. State's Lodging D-4 at 336. To the extent that the prosecutor was using sarcasm by saying "but this was no ordinary vacation," no harm resulted from this innocuous remark—because there is too much evidence in the record showing that the purpose of the trip was to rob a bank, not take a vacation. For example, if the purpose of the 24-hour rental of the black minivan from Enterprise was for a vacation activity—Petitioner has never revealed the alternative activity. Nor has there been any explanation for the checking out and checking in of the hotel in the same day. Nor is there any explanation for the high speed chase—again, not a regular feature of a vacation. Smith was not ineffective for failing to object to an accurate characterization of the evidence or the slight sarcasm of the prosecutor in her opening statement. The Court concludes that Petitioner's claim will be denied and dismissed with prejudice on de novo review.

### 6. Discussion of Claim 4(d)(ii)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's opening statement that Petitioner knew exactly what he was doing when he drove away

from the crime scene. State's Lodging A-3 at 153. The prosecutor explained that the jury

would hear evidence about the October 18, 2011 attempted robbery of the KeyBank in

Meridian, but that Petitioner was not charged with that robbery. Rather, the October 18th

incident was merely "informative":

> It's informative because it tell us what Mr. Parsons
> knew. When his wife came running out of the bank on
> October 18th wearing a costume and then went into another
> bank two days later wearing a different costume, he knew this
> was no ordinary vacation. He knew exactly what he was
> doing as he drove her away from the crime scene, which was
> demonstrated by the way he drove when law enforcement
> tried to pull him over.

*Id*.

Petitioner does not explain why the prosecutor acted wrongfully in discussing the

narrow reason for the admission of the October 18th incident and then explaining that the

prior robbery attempt would be evidence showing that Petitioner knew that his wife was

going to try to rob a bank each time she put on a costume and he drove her to a bank and

waited outside. There is no prosecutorial misconduct, and hence no ineffective assistance

of counsel. This claim will be denied and dismissed with prejudice.

### 7. Discussion of Claim 4(d)(iii)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's

opening statement that Keisha Bloxham was going to testify that "someone who looked a

lot like" Petitioner was driving the blue minivan with Connecticut license plates. *Id*. In

fact, Bloxham described the driver of the minivan as a 50-ish balding man of about 250

to 300 pounds, a description that fit Petitioner at the time of the crime. State's Lodging

A-3 at 551. There is no prosecutorial misconduct, and hence no ineffective assistance of

counsel. This claim will be denied and dismissed with prejudice.

### 8. Discussion of Claim 4(d)(iv)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's opening statement that Keisha Bloxham's testimony about the initial attempted robbery would show that Petitioner knew his wife was robbing the bank two days later. This is the same content addressed directly above in the discussions of Claims 4(d)(ii) & (iii). There is no prosecutorial misconduct, and hence no ineffective assistance of counsel. This claim will be denied and dismissed with prejudice.

### 9. Discussion of Claim 4(e)(i)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's statements in closing argument that Felicia told a detective she was counting the money as the couple was going down I-84. This is the same argument and content addressed above. There was no inaccuracy and hence no prosecutorial misconduct. For the same reasons, Petitioner has not shown that he is entitled to relief under either prong of the *Strickland* test. This claim will be denied and dismissed with prejudice.

### 10. Discussion of Claim 4(e)(ii)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's closing statement, "Then they also have the police scanner that's found at the crash[,] screen in the on position, not to white noise, but it's actually emitting frequency." State's Lodging A-3 at 594. Petitioner argues that this statement does not reflect Officer Chris Davis's actual testimony, which was that the scanner was on, *but* it was turned to what Davis thought was "an EMS channel," not a police traffic channel. *See* State's Lodging

A-3 at 376. There is no distortion of the truth in this statement. The prosecutor said only that it was on and emitting frequency, which reflects Davis' testimony. The prosecutor did not say *police* frequency. The important point is that the scanner was *on* when it was found at the scene of the wreck, and the jury was left to determine whether this made it more or less likely that Petitioner helped commit the robbery. There is inaccuracy, and hence no prosecutorial misconduct. There is no ineffective assistance for failing to object to accurate evidence descriptions. This claim will be denied and dismissed with prejudice.

## 11. Discussion of Claim 4(e)(iii)

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's closing statement that:

> [t]he money is also the motivation for this crime. You heard that on video, State's Exhibit 16. They didn't commit this for adrenalin rush. They needed the money. Felicia told you that.

State's Lodging A-3 at 595.

The statement was an accurate representation of what Felicia said on the police accident scene video/audio—that they needed money for medical bills. As noted above, no objection was made as to hearsay, and none could have been made about an inaccurate portrayal of Felicia's statement because the statement was accurate. Smith's lack of objection to the video/audio evidence upon which the prosecutor's closing remarks were based was part of defense counsel's strategy—a strategy that was nether deficient nor prejudicial. This claim fails on the merits under any legal theory on de novo review. It will be denied and dismissed with prejudice.

12. **Discussion of Claim 5(c)**

Petitioner asserts that Smith was ineffective for failing to object to the prosecutor's statement at the preliminary hearing that Keisha Bloxham reported the exact license plate numbers of the minivan to the dispatcher. *See* State's Lodging A-2 at 28-29. This information was not used at trial. Rather, at trial, the prosecutor stated in opening that Bloxham was going to testify that she saw Felicia get into a blue minivan with Connecticut plates on October 18th. State's Lodging A-3 at 152.

Petitioner has not shown how something that was reported in the preliminary hearing that was not restated at trial in front of the jury is relevant to the jury verdict. The information regarding the Connecticut plates relayed to the jury in the opening statement was accurately reflected in Bloxham's trial testimony. *Id*. at 550. Petitioner has not shown that Smith performed deficiently or that prejudice occurred. Hence, this claim will be denied and dismissed with prejudice.

13. **Discussion of Claim 6**

In Claims 6(a) through 6(e), Petitioner asserts that his constitutional rights to due process and to confront the witnesses against him were violated by certain witness testimony and comments made by the prosecutor at various points in the state court proceedings.

A.  *Standard of Law for Confrontation Clause and* *Due Process Clause* *Claims*

The Confrontation Clause of the Sixth Amendment guarantees an accused the right to confront and cross-examine the witnesses against him. This right of confrontation

prohibits the admission of testimonial out-of-court statements unless (1) the declarant is unavailable to testify and (2) the accused had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Testimonial statements are those that are made for purposes of investigation or prosecution, such as the following: (1) statements made in prior testimony; (2) "[s]tatements taken by police officers in the course of interrogations"; (3) "formalized" statements, e.g., affidavits, depositions, and confessions; (4) "pretrial statements that declarants would reasonably expect to be used prosecutorially"; and (5) "statements that were made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Id*. at 51-52 (internal quotation marks omitted). "[N]on-testimonial statements do not implicate the Confrontation Clause" because they are not made for purposes of investigation or prosecution. *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009).

A defendant or defense counsel may waive the Sixth Amendment right to confrontation by, for example, failing to—or choosing not to—"object to the offending evidence." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313 n.3 (2009); *see also Wilson v. Gray*, 345 F.2d 282, 286 (9th Cir. 1965) ("It has been consistently held that the accused may waive his right to cross examination and confrontation and that the waiver of this right may be accomplished by the accused's counsel as a matter of trial tactics or strategy.").

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court outlined the important purposes of the due process right of cross-examination of adverse witnesses:

The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.' *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970); Bruton v. United States, 391 U.S. 123, 135—137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It is, indeed, 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *E.g., Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). But its denial or significant diminution calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined. *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

*Id*. at 295.

### B. Discussion of Claim 6(a)(i)

Petitioner asserts that his Due Process Clause and Confrontation Clause rights were violated by the admission at trial of Felicia's "out-of-court confession ... under police interrogation." Dkt. 3 at 20. He argues that the Confrontation Clause was violated by admission of a co-defendant's statement during interrogation because the testimony was offered to prove the truth of the matter asserted. Dkt. 39-5 at 5.

In actuality, Felicia's recorded hospital confession to Detectives Wigington and Ayotte (State's Lodging C-1 at 300-56) was not introduced or admitted at Petitioner's trial. *See* State's Lodging A-3 at 7-8. Therefore, Petitioner's allegation in Claim 6(a)(i) is simply wrong as a factual matter. Because the confession was not admitted into evidence, there was no Confrontation Clause or Due Process Clause violation. The portions of the

confession that were re-stated by trial witness Detective Wigingon will be addressed below. This claim fails for lack of a factual or legal basis and will be denied and dismissed with prejudice.

### C. *Discussion of Claim 6(a)(ii)*

Petitioner contests the prosecutor's playing of a video and audio taken at the scene of the crash. The video showed Felicia trapped halfway inside and halfway outside the car and contained audio of her shouting out several statements relevant to the robbery. State's Lodging A-5 at 4. Petitioner asserts that playing the video/audio for the jury violated his Confrontation Clause and Due Process Clause rights.

The video/audio of the scene of the crash taken by Nampa city police officer Tyler Gray was authenticated by his testimony at trial. It was not objected to by Petitioner's counsel and was properly admitted into evidence. State's Lodging A-3 at 280. The 20-minute video showed Felicia and Petitioner trapped in their car, captured Felicia's excited utterances, and lasted until paramedics extricated Petitioner from the overturned car. The jury saw the video after direct examination of Gray. *Id*. at 292. Smith then examined Gray on some of the excited utterances of Felicia on the video, including: "There's just one gun. It's my gun." and "He's got internal bleeding, motherfuckers. Why do you think I did this fucking robbery?" *Id*. at 294-95.

In accordance with the law cited above, Petitioner waived any Confrontation Clause and Due Process Clause claim by Smith failing to object to admission of the video/audio. Second, because the video/audio was a way to introduce Felicia's claimed ownership of the gun and responsibility for the robbery to the jury without subjecting her

to cross-examination on topics that would be damaging to Petitioner's case, Smith's strategy to allow the video/audio in was neither deficient performance nor prejudicial. Therefore, this claim fails on the merits under any legal theory on de novo review. This claim will be denied and dismissed with prejudice.

### D. Discussion of Claim 6(a)(iii)

Petitioner generally alleges that police officers testified about "hearsay statements" made by Felicia, violating his due process and confrontation rights. Petitioner attempts to raise the question that the statements were made for the truth of the matter asserted, and not for any exception for which hearsay normally would be admitted. However, as discussed above, to have the hearsay statements admitted for the truth of the matter asserted was a calculated strategy call by his counsel. Because his counsel did not object, and in fact, used the substance of the testimony to Petitioner's advantage by stratagem, there was neither deficient performance nor prejudice. Therefore, this claim fails on the merits under any legal theory on de novo review. It will be denied and dismissed with prejudice.

### E. Discussion of Claim 6(b)

In Claim 6(b), Petitioner challenges the prosecutor's opening statement to the jury that, "when asked, Mr. Parsons explained that [he and Felicia] were here on vacation, but this was no ordinary vacation." State's Lodging A-3 at 147. The prosecutor then went on to describe the bank robbery. Petitioner claims this statement violated his confrontation and cross-examination rights because it was actually Felicia, not Petitioner who reported they were on vacation. (Dkt. 3 at 20.)

However, as described above in the discussion of Claim 4(d)(i), the prosecutor's statement accurately described the evidence later admitted at trial. Officer Dave Saindon testified that, while riding with Petitioner in the ambulance, Petitioner stated that he "was vacationing" in Idaho with his wife, Felicia. State's Lodging D-4 at 336. Petitioner had opportunity to challenge Saindon's testimony on cross-examination. Therefore, Petitioner's claim will be denied and dismissed with prejudice on de novo review.

### F. Discussion of Claim 6(c)

Petitioner asserts that Detective Wigington violated the Confrontation Clause and the Due Process Clause when he testified on redirect examination that Felicia told Wigington she started counting the money from the robbery inside the car, thus supporting the prosecution's theory that Petitioner knew Felicia had robbed the bank when he initially fled the scene and later fled from the police. Respondent counters that Petitioner opened the door to this testimony by asking about other statements in Felicia's confession on cross-examination.

On direct examination, Detective Wigington did not testify about anything Felicia told him.[5] *See* State's Lodging A-3 at 436-78. On cross-examination, Smith elicited the following testimony about the money found by the police:

> Q.     So without actually having a record of serial numbers,
>           you wouldn't be able to say whether one $20 bill is
>           pretty much the same as another one?

---

[5] Respondent mistakenly states that, on direct examination, Detective Wigington was asked a question about something Felicia had said and answered affirmatively, but that defense counsel's objection to the question was sustained. (Dkt. 38 at 29.) However, this exchange actually occurred during the prosecutor's examination of Corporal Stephen Van Doren, not Detective Wigington. (*See* State's Lodging A-3 at 341-47.)

A.     With the exception of the bait bills, yes.

Q.     So if there was a bait bill and there was a record of that, you'd be able to track that because you'd have a record of the serial number; correct?

A.     Yes.

Q.     But any other $20 bill that was found in a back yard or a parking lot or a wallet could just be another $20 bill; right?

A.     Correct.

Q.     And so with respect to the money that you found in the car or in the yard, you can't necessarily say whether any of that was taken from the bank, can you?

A.     With—no, again, with the exception of the bait bills.

(*Id*. at 479-80.)

Smith also asked Detective Wigington about things that Felicia had said in her statement to police:

Q.     Did you have a conversation with Felicia Parsons?

A.     Yes, I did.

Q.     At all times is it true that she took responsibility and said that Mr. Parsons did not rob any bank ever?

A.     She did, yes, during that interview.

....

Q.     So Mrs. Parsons took responsibility for [robbing the bank on October 20, 2010] and several other banks; is that right?

A.     Yes, she did.

Q.     And she at all times maintained that Mr. Parsons never robbed any bank; is that right?

A. Up until recently, yes.

Q. I don't think I'm going to ask for clarification of that question. What I'm asking is when you spoke to her on October 20th or 21st is it not true that she maintained Mr. Parsons never robbed a bank?

A. Yes.

*Id*. at 481-82.

On redirect, the prosecutor immediately began exploring more of Felicia's statements:

Q. Has Felicia Parsons reported to you that she's pretty madly in love with Daniel Parsons.

A. Yes, every conversation.

Q. And she has reported that she is solely responsible for this event; is that true? At various times she's told you she's the only one that should be held accountable?

A. Yes.

Q. In those same conversations has she reiterated to you how much she loves him?

A. Oh, yes.

Q. You indicated to [defense] counsel that you didn't know that this money that was kind of all over the car and in the backyard came from this robbery; is that— you don't have first-hand observer's knowledge; is that correct?

A. Correct.

Q. But, during your conversation with Felicia Parsons, where does she report this money came from?

A. The Broadway bank.

Q. And what was she doing with it that it ended up getting spread out all over this car?

A. She stated that while they were traveling from the bank toward Canyon County, she was initially counting the money at one point inside the vehicle.

(*Id*. at 482-83.)

There is no question that Felicia's out-of-court statements to Detective Wigington were testimonial, and therefore subject to the Confrontation Clause. However, the question this Court must answer is whether Petitioner—having been the party who first inquired into Felicia's statement—can now complain that the prosecutor followed suit.

The United States Supreme Court has not determined specifically whether a defendant waives a Confrontation Clause objection to a testimonial statement by cross-examining a witness about the statement, thus opening the door to allow the prosecution also to elicit testimony about the statement. Further, the Court has not found a published Ninth Circuit case on this question, though several unpublished decisions have been issued. *See United States v. Quinones-Chavez*, 641 F. App'x 722, 725-26 (9th Cir. Feb. 24, 2016) (unpublished) (holding that testimony did not violate Confrontation Clause of non-testifying witnesses in part because it "emerged only after defense counsel opened the door by eliciting testimony concerning these witnesses"); *United States v. Kloeppel*, 5 F.3d 542 (9th Cir. Aug. 18, 1993) (unpublished) (holding that trial court's admission of appraisal reports did not violate the Confrontation Clause because defendant "opened the door for the admission of these records by creating a false impression about the value of the property appraised in the reports. Once the door was opened, the

government was entitled to introduce the reports to correct the false impression").

Other courts reviewing the issue have come to different conclusions. *Compare United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), *with United States v. Lopez-Medina*, 596 F.3d 716, 733 (10th Cir. 2010). The Sixth Circuit has held that the admission of a testimonial statement, without the opportunity to cross-examine, violates the Confrontation Clause even if the defendant has first opened the door by asking about a portion of that statement. *Cromer*, 389 F.3d at 379 ("If there is one theme that emerges from *Crawford*, it is that the Confrontation Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admission of hearsay statements. Thus, the mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation.").

However, *Cromer* is based on a strained reading of *Crawford* and would allow a defendant to introduce helpful parts of an out-of-court statement but prohibit the State from clarifying or rebutting those parts of the statement by inquiring into other parts of that same statement—a result not likely intended by the *Crawford* decision itself. Further, the Supreme Court's later decision in *Melendez-Diaz* calls *Cromer* into question. If, as the Supreme Court stated in *Melendez-Diaz*, a defendant can forfeit a Confrontation Clause claim by *failing to object* to the introduction of a testimonial statement, 557 U.S. at 313 n.3, then it likely follows that a defendant can also forfeit (or knowingly waive) that claim by *actively introducing* a portion of that statement. *Cf. United States v. Tarantino,* 846 F.2d 1384, 1407 (D.C. Cir. 1988) (per curiam) (holding that restriction on

cross-examination, which forced defendant to make tactical decision whether to cross-examine a witness and open the door to other contextual information, did not violate right of confrontation or constitute an abuse of discretion).

The Court finds the Tenth's Circuit's analysis in *Lopez-Medina* persuasive. In that case, defense counsel expressly told the trial court that he intended to open the door, on cross-examination, to an out-of-court statement of a confidential informant, thereby knowingly waiving the right of confrontation. 596 F.3d at 731. The prosecutor, on redirect, elicited additional testimony about that statement. The Tenth Circuit disagreed with *Cromer* and held that the defendant had waived his Confrontation Clause claim in a limited manner: "If the *Cromer* rule were correct, a defendant would be free to mislead a jury by introducing only parts of an out-of-court statement, confident that the remainder of the statement could not be introduced because the Confrontation Clause would provide a shield." *Id*. at 733 (internal quotation marks omitted). Therefore, the court held that the defendant could not raise a confrontation claim on appeal after having waived it at trial.

This Court agrees that "[t]he Confrontation Clause is a shield, not a sword," and, therefore, "a defendant can open the door to the admission of evidence otherwise barred by the Confrontation Clause" and afterward he may not prevent the State from rebutting those statements. *Lopez-Medina*, 596 F.3d at 732. Any other reading would essentially allow a defendant to pick and choose favorable portions of an otherwise inadmissible statement, while—at the same time—keep the prosecution from fairly responding with unfavorable portions. The jury, thus manipulated, would see a skewed picture of reality. The Sixth Amendment does not countenance, let alone require, such an absurd result.

This is not to say that a defendant who inquires into a hearsay statement on cross loses all challenges with respect to additional testimony about the statement on redirect. The prosecution's re-direct examination is limited to the subject matter of cross-examination.

In addition, "[i]f counsel's decision to waive his client's confrontation right [on cross-examination] was made over the client's dissent or was not a legitimate trial tactic, the client might have a viable claim of ineffective assistance of counsel." *Id*. at 731 n.8. As stated elsewhere herein, Smith's decision to have Felicia's statements admitted into evidence in a manner other than having her testify was sound, and no ineffective assistance claim lies for waiver of confrontation and due process confrontation rights.

Further, the decision in this action should not be construed to permit *any* inquiry into any portion of a hearsay statement a defendant raised. Rather, here, the questioning on redirect was without question a fair response to the questioning on cross. That is, when Smith probed that Felicia took full responsibility for the robbery, the prosecutor was permitted to probe whether Felicia had said anything that would indicated why she did so—such as her love for and desire to protect Petitioner. When Smith discussed the origin of the bills found at the scene of the car wreck, the prosecutor was permitted to ask the investigator if Felicia had stated where the money had come from.

Finally, the Court notes that the law is not well-settled whether the Confrontation Clause is subject to harmless error analysis, but, even if it were, Petitioner would not prevail on this claim. The prosecutor elicited from Felicia statements that loved Petitioner very deeply. Given that they were married, it would be difficult if not impossible to

impeach her on this subject. Similarly, there was much evidence about the amount and type of money stolen from KeyBank, and this additional reference to the original of the money was merely cumulative. While whether harmless error analysis of these issues presents an interesting legal issue because the law is not well-settled in the Ninth Circuit or in the United States Supreme Court, there is no real factual issue here.

For the foregoing reasons, the Court concludes on de novo review that Petitioner is not entitled to relief on the merits of Claims 6(a). It will be denied and dismissed with prejudice.

### G. Discussion of Claim 6(d)

In closing argument, the prosecutor spent several paragraphs describing everything that witness Keisha Bloxham had seen and how she identified the driver of what she describes as a "navy minivan." The prosecutor wanted to make the point that Bloxham's description of the driver as being "heavy set, about 250 to 300 pounds" matched what Felicia said at the crash scene, which was that Petitioner was 330 pounds. However, the prosecutor accidentally interchanged the names and said "Felicia" instead of "Keisha." State's Lodging D-4 at 591. The court reporter noticed the misstatement, and noted it in the record: "So he's right near that range of what Felicia [verbatim] describes as the driver of the minivan." State's Lodging D-4 at 591 (parenthetical in original).

The Court concludes that no harm came from this mistake, because it was clear from the prosecutor's context that she meant to say "Keisha" but inadvertently said "Felicia." An objection would have been an unnecessary interruption because the context

made it clear what the prosecutor meant. There is no confrontation or cross-examination deficiency arising from this obvious mistake.

Petitioner also argues that Bloxham's testimony was improperly admitted because she did not have any direct knowledge of the facts. Dkt. 39-6 at 41. However, the prosecutor properly laid foundation showing that Bloxham was a bank employee, had been trained in how to recognize unusual circumstances that might present a security risk, saw Felicia in clothing similar to that found in the couple's wrecked car, saw Felicia acting suspiciously, and saw Felicia get into the van that matches the rental vehicle with a driver that matched the description of Petitioner, Felicia's husband. Bloxham testified about the facts of which she had knowledge.

Adding this argument does not bolster Petitioner's confrontation or cross-examination claims regarding the mis-statement of the prosecutor in closing or the testimony of Bloxham at trial. Petitioner had the opportunity to confront and cross-examine Bloxham at trial. This claim will be denied and dismissed with prejudice.

### H.  Discussion of Claim 6(e)

Petitioner asserts that his rights under the Due Process and Confrontation Clauses were violated when police officers described Felicia's out-of-court statements and the prosecutor later commented based on that testimony. Petitioner particularly contests the prosecutor's comment in closing argument that Felicia said they needed money to pay medical bills. However, the statement was an accurate representation of what Felicia said on the police accident scene video/audio, and confrontation and cross-examinations rights as to Felicia herself were waived as a part of the defense strategy. This claim fails on the

merits under any legal theory on de novo review. It will be denied and dismissed with prejudice.

14. **Discussion of Claim 7**

In Claim 7, Petitioner asserts that the prosecutor committed misconduct by making certain comments, including some of the same comments challenged in Claim 6. The prosecutorial misconduct standard of law is set forth above where the Court discussed whether Smith was ineffective for failing to object to alleged prosecutorial misconduct based on nearly all the same factual bases. In this claim, there is no *Strickland* overlay to the analysis, but the Court's prior analysis of whether there was prosecutorial misconduct in the first instance will be referenced but not repeated.

### A. Discussion of Claim 7(a)

Claim 7(a) is a duplicate of Claim 5(c), regarding prosecutorial misconduct centered on Bloxham's alleged reporting of the rented minivan's license plate number during the preliminary hearing—a fact which was not repeated at the jury trial. For the reasons stated above, it is subject to denial and dismissal with prejudice.

### B. Discussion of Claim 7(b)

Claim 7(b) is a duplicate of Claim 4(d)(i), regarding prosecutorial misconduct for opening remarks about the couple's vacation. For the same reasons stated above, it is subject to denial and dismissal with prejudice.

### C. Discussion of Claim 7(c)

This claim is a duplicate of Claim 4(e)(ii), with the exception that the claim centers on the prosecutor's opening statement, rather than the closing argument, about the

scanner. The prosecutor's words are virtually the same—no reference to it being tuned to a *police* frequency—and so this claim meets the same demise. It will be denied and dismissed with prejudice.

### D. Discussion of Claim 7(d)

This claim is a duplicate of Claim 4(d)(ii), regarding the prosecutor's opening remarks about evidence that would show that Petitioner knew that Felicia was going to commit the robbery on October 20th. This claim will be denied and dismissed with prejudice for the same reasons set forth above.

### E. Discussion of Claim 7(e)

Petitioner contests the prosecutor's closing remark that "we know" Petitioner came to Boise to commit the robbery. The prosecutor began her closing argument with the fact that a robbery occurred—the first necessary element of the crime of aiding and abetting robbery. Petitioner rightly observes that the fact that the robbery occurred does not show *his* knowledge. However, he is taking too narrow a view of the prosecutor's introduction to her closing argument. The introduction was to the *whole* argument, not to only the next subtopic the prosecutor discussed—that a robbery occurred. As the prosecutor went on, it became clear that her argument's organizational plan was to hit every element of the crime in list-fashion, and that she was not, as Petitioner asserts, trying to say that the fact the robbery occurred *shows* that Petitioner planned it. That is a nonsensical reading of the transcript, and the Court rejects it as prosecutorial misconduct. Petitioner's claim will be denied and dismissed with prejudice.

### F.  Discussion of Claim 7(f)

Petitioner asserts that the prosecutor committed misconduct in closing argument by mistakenly saying "Felicia" instead of "Keisha," as discussed above. This is the same claim as 6(d), and it will be denied on the merits and dismissed with prejudice for the reasons stated above.

### G.  Discussion of Claim 7(g)

This is the same claim as 6(d), regarding Felicia's out-of-court excited utterances about needing money to pay medical bills as the reason for having robbed the bank. This claim will be denied on the merits and dismissed with prejudice for the reasons stated above.

## CONCLUSION

Petitioner is not entitled to relief on his Petition for Writ of Habeas Corpus. Many of his claims are frivolous, and he has wasted public resources in pursuing them. Petitioner is not entitled to discovery or an evidentiary hearing. The Court has done its best to separate Petitioner's mass of claims into separate claims and subclaims, considering each on its own merit. To the extent that it has not expressly addressed one of the subclaims, this Court implicitly rejects it and rejects the Petition in its entirety as not warranting habeas corpus relief. The entire Petition will be dismissed with prejudice and his motions will be denied. A certificate of appealability will not issue.

## ORDER

**IT IS ORDERED:**

1.      Petitioner's Request for an Evidentiary Hearing (Dkt. 48) is DENIED.

2.    Petitioner's Request for Discovery (Dkt. 49) is DENIED.

3.    The Petition for Writ of Habeas Corpus (Dkt. 3) is DENIED and

DISMISSED with prejudice.

4.    The Court does not find its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

§ 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. In fact,

many of Petitioner's claims are frivolous, and it is clear that he is not

actually innocent. Further litigation is a waste of public resources. If

Petitioner wishes to appeal, he must file a timely notice of appeal with the

Clerk of Court. Petitioner may seek a certificate of appealability from the

Ninth Circuit by filing a request in that court.

DATED: March 29, 2019

David C. Nye
Chief U.S. District Court Judge